## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA

v.

MANUEL ADAN YANEZ-CRUZ,
a/k/a ROCKY,
                    Defendant.

Case No. 19-cr-10268-LTS

### SENTENCING MEMORANDUM OF THE UNITED STATES

Defendant Manuel Yanez-Cruz is a leader of a Massachusetts clique of La Mara Salvatrucha, a/k/a MS-13, one of the largest and most violent criminal enterprises in the world.  The Defendant shared leadership in the Huntington Locos Salvatrucha (the "Huntingtons" or "HLS" clique of MS-13) alongside fellow MS-13 gang member and clique leader Edwin Amaya Mejia Alvarado a/k/a Duende ("Amaya" or "Duende").[1]  The Defendant was committed to the gang's objectives, which ranged from actively recruiting gang members, collecting and transmitting dues to El Salvador, coordinating with MS-13 leaders in and outside of the United States, and engaging in and promoting violence on MS-13's behalf.  That violent conduct included murder and attempted murder, and it targeted the elimination of suspected gang rivals or cooperators.

Evidence, including numerous communications between the Defendant and Duende, an intercepted state-wiretap communication between the Defendant and a high-ranking Huntington leader, and information from cooperating witnesses showed the Defendant's dedication to MS-13, a gang infamous for its history of brutality against

---

[1] Duende is charged separately in the matter of *United States v. Edwin Amaya Mejia Alvarado a/k/a Duende*, 19-cr-10132-IT, also with racketeering conspiracy in violation of 18 U.S.C. § 1962.

perceived threats.  Given MS-13's notoriety for senseless savagery, and his multi-year membership in the gang as well as his leadership role, it was reasonably foreseeable to the Defendant that gang members would conspire to commit murder (as well as other acts of violence) on the enterprise's behalf.

Evidence establishing the foreseeability of violence for the Defendant, however, was not strictly limited to the fact that he was a member within MS-13 generally or a leader in the Massachusetts-based HLS clique specifically.  Rather, the investigation revealed the Defendant's advance knowledge of and involvement in multiple acts of murder or attempted murder over a multi-year period.  Those acts, based on information from multiple cooperating witnesses, included (1) the December 2016 murder of a perceived gang rival, which (according to one cooperating witness) the Defendant warned of prior to its occurrence, for which (according to multiple cooperating witnesses) the Defendant subsequently claimed credit, and at which he was present; (2) the Defendant's involvement in a plot to kill another suspected gang rival (who miraculously survived the attempt); (3) the Defendant's awareness of another clique's targeting of a victim for murder hours before the killing occurred; and (4) the Defendant's arrest in 2018 for his suspected involvement in a near-attack on a gang rival, resulting in him pleading guilty to carrying a dangerous weapon, *see* PSR ¶ 130.  Stated simply, the Defendant knew, understood, shared, and took steps to further MS-13's core objectives, including significant violence up to and including murder.

Notably, at the time law enforcement initially arrested the Defendant, the particular acts of violence listed in the Defendant's PSR remained under investigation. Stated differently, law enforcement viewed the Defendant as a threat to public safety and a danger to the community ***before having affirmatively connected him to the***

***multiple specific acts of violence set forth in his offense conduct***.  In particular, law enforcement was aware of the Defendant's co-leadership position in the expanding Massachusetts-based HLS clique—merely two years after law enforcement had done a massive takedown of over sixty MS-13 members in the District of Massachusetts in 2016. Through his active recruitment of local high schoolers into MS-13, the Defendant promoted a culture of violence.  Specifically, the Defendant (alongside his co-clique leader) lured young men into the gang and groomed them for aggression, teaching them MS-13's mandates on eliminating perceived gang threats (whether rivals or cooperators), encouraging them to commit violence to achieve elevated gang status and reputation, and governing through fear by warning of the consequences of violating MS-13's ordinates (namely, beatings or death).  Law enforcement arrested the Defendant out of concern that he—either himself directly or via the members whom he was conditioning for violence— would unleash a new wave of violence in the Boston area.  Indeed, that fear concretized when investigators learned the Defendant had been arrested by the state in connection with the apparent threatening and attack on a perceived gang threat in broad daylight on a public street.  Subsequently, investigators realized that the seeds of violence the Defendant had been sowing in the years following the 2016 takedown had begun to take root and spread well before his arrest.

The Defendant has pleaded guilty to RICO conspiracy under 18 U.S.C. § 1962(d) on behalf of the MS-13 enterprise.  Notably, however, in his objections and even probation interview, the Defendant equivocates regarding what violent conspirac(ies) he was aware of, participated in, and/or discussed with others; with whom he conspired; and refuses to answer probation's questions about gang involvement or membership—***in a case in which he has pleaded to being a leader in a racketeering conspiracy***

***involving the MS-13 enterprise***. *See* PSR ¶ 151.  The government questions whether the Defendant truly recognizes the harm he has caused and accepts responsibility for the same; the government has significant concerns about the threat to public safety that an MS-13 leader like him will pose once released; and the government is mindful of the need for a sentence in this case to reflect the seriousness of the offense, provide just punishment, promote respect for the law, afford adequate deterrence, and protect the public from further crimes of the Defendant.

For these and other reasons set forth herein, the government respectfully requests that the Court sentence the Defendant to ***180 months in prison*** to be followed by ***three years of supervised release***.  The government believes this sentence is sufficient but not greater than necessary to comply with the factors under 18 U.S.C. § 3553(a) and is consistent with other sentences this Court has issued for other MS-13 defendants convicted of same or similar conduct and who either have held lesser roles (and received 10+ year sentences) or roles equivalent to the Defendant's (and received 20+ year sentences).  Notably, the government's recommendation under the terms of the Rule 11(c)(1)(C) plea is already a ***significantly below guidelines*** recommendation.  No further downward variance is required or would be appropriate given the nature and circumstances of the crime, the history and characteristics of the Defendant, and the other § 3553(a) sentencing factors.

I. **Probation Has Properly Calculated the Guideline Sentencing Range, Which is the Statutory Maximum of 20 Years in Prison**

Before turning to a discussion of the 18 U.S.C. § 3553(a) factors, the government comments briefly on the guideline calculations in the PSR and the Defendant's numerous objections to the PSR.

The U.S. Probation Office properly applied the guidelines in this case and concluded that the Defendant's racketeering conspiracy included his involvement in both murder (group 1) and attempted murder (group 2). *See* PSR ¶¶ 102-119. After grouping and enhancements, the Defendant's ***combined adjusted offense level was 50,*** and even after credit for acceptance of responsibility, the Defendant's offense level was higher than the maximum offense level of 43 contemplated by the guidelines. PSR ¶¶ 123, 127. Based upon the maximum total offense level of 43 and a criminal history category of II, the Defendant's guideline range would typically have been ***life in prison***. *Id.* ¶ 165. Here, based on the statutory maximum sentence of 20 years in prison, the Defendant's guideline range is 240 months in prison. The government notes this not only to share its agreement with Probation's guideline calculations, but to highlight for the Court that the government's sentencing recommendation in this case is measured and has taken into account various potential mitigating factors, including the Defendant's youth and circumstances. The government's sentencing recommendation of 180 months is ***25% below the bottom of the guideline range*** in this case.

As for the ***50 objections filed by the defense***, *see* PSR pp. 51-69, to the extent multiple objections appeared to challenge the Defendant's offense conduct and or guideline calculations, the government was and will be prepared to litigate the matter at sentencing and address for the Court how each of the violent acts attributable to the

Defendant and each of the guideline provisions that were applied to the Defendant are supported by the facts. A number of the objections in the final PSR appear to object to critical facts that the government believes would have necessarily had to have been resolved before the Court could sentence the Defendant. *See, e.g.*, Objection 8 (objecting to Defendant's participation in the murder of Ruano); Objection 9 (objecting to Defendant's participation in the attempted murder of victim 30); Objection 31 (objecting to guideline calculations); Objection 32 (objecting to the murder); Objection 33 (objecting to the offense level calculation); Objection 34 (objecting to leadership enhancement); Objection 35 (objecting to enhancement for use of minors); etc.

It appears however, that the Court will not need to engage in any fact-finding on these points as they relate to either the calculation of the guidelines or whether the murder was reasonably foreseeable to the Defendant. Via an email dated November 3, 2022, the defense informed the government that it now agrees (or does not intend to challenge) that the government can prove, at least by a preponderance of the evidence, that the Defendant conspired in the murder of Ruano and that the offense level should be 43. Accordingly, given that recent representation, the government does not anticipate any dispute at sentencing over the final offense level (43) or the final guideline range (240 months in custody) that should apply. The government leaves up to the defense to highlight for the Court any specific objection it still wishes to have the Court rule on, and the government will be prepared to address any remaining objections at the sentencing hearing.

Based on where things stand, at the sentencing hearing, the government anticipates asking the Court to adopt the final PSR as the factual findings of the Court, and to then move forward with an analysis of the 18 U.S.C. § 3553(a) factors and a discussion of what is the appropriate sentence to impose in this case.

## II.   The Factors Outlined in 18 U.S.C. § 3553(a) Support the Government's Recommended Sentence of 15 Years in Prison

As addressed further herein, each of the factors set forth in 18 U.S.C. § 3553(a), individually and in combination, support the government's recommended 15-year sentence.

### A.   The Nature and Circumstances of the Offense Support the Government's Proposed Fifteen-Year Sentence[2]

#### 1.   The MS-13 Criminal Enterprise

The Defendant is a member of MS-13, a notoriously violent gang whose core objectives involve murder.  *See generally* PSR ¶¶ 12-30.  That is the prism through which the Defendant's admitted leadership role, admitted recruitment efforts, and knowledge of and/or participation in gang-related violence must viewed.  The First Circuit has acknowledged MS-13's vicious mission in related cases in recent years, as well, in affirming multiple convictions and sentences of MS-13 defendants charged in Massachusetts.  *See, e.g.*, *United States v. Perez-Vasquez*, 6 F.4th 180, 187 (1st Cir. 2021) (stating "MS-13 has defined its primary mission as killing rivals, especially members of the 18th Street gang"); *id.* ("MS-13 members are forbidden from cooperating with law enforcement.  A member who cooperates with law enforcement will have a 'green light' put on him, which means he will be killed by other MS-13 members."); *United States v. Gonzalez*, 981 F.3d 11, 14 (1st Cir. 2020) ("MS-13 has gained notoriety for the brutality of its crimes and the relative youth of both its members and its victims";  stating "[t]he core purpose of MS-13 is to kill or maim rival gang members and collect money for MS-13's leadership"); *see also* Indictment, ¶ 5.

---

[2] The United States relies upon the offense conduct set forth in the final Presentence Report (PSR), including paragraphs 9 through 98n.

The core operating principles of MS-13 are well-established: MS-13 members are to murder gang rivals and those suspected of cooperating with law enforcement. *See* Indictment, ¶ 5 ("Members of MS-13 and their associates followed certain core rules and operating principles" "including the core operating principles that (i) members of the enterprise attack members of rival gangs and those who pose a threat to the ongoing operations of the enterprise, and (ii) members of the enterprise internally discipline fellow MS-13 members who violate the rules of the enterprise"). *Compare with United States v. Perez-Vasquez*, 6 F.4th 180 (1st Cir. 2021):

> MS-13 has defined its primary mission as killing rivals, especially members of the 18th Street gang. If possible, a homeboy is supposed to kill a rival gang member, known as a "chavala," on sight. MS-13 members are also required to help out fellow gang members whenever they are asked.

> MS-13 members are forbidden from cooperating with law enforcement. A member who cooperates with law enforcement will have a "green light" put on him, which means he will be killed by other MS-13 members.

*Id.* at 187 (affirming life in prison sentence for an MS-13 member convicted of RICO conspiracy and murder).

MS-13's infamousness for senseless violence makes it disturbingly unique from a typical criminal gang such that, as the Presentence Report indicates, in 2012, MS-13 became the first street gang to be designated by the United States government as a "transnational criminal organization" or TCO. *See* PSR ¶ 19. In 2017, the President of the United States directed a whole-of-government approach to dismantle MS-13 and certain other high-priority TCOs. *See id.* And in 2018, the Attorney General of the United States created the Transnational Organized Crime Task Force, specifically targeting five of the

highest-priority TCOs in the world:  MS-13; Hezbollah; Sinaloa Cartel; Clan del Golfo; and Cartel de Jalisco Nueva Genaracion.  *Id.* [3]

The nature and circumstances of the Defendant's offense are troubling when considered against this important background.  As further detailed herein, the Defendant ambitiously sought to reconstitute MS-13 in the Boston area following the void left by law enforcement's historical 2016 takedown of multiple MS-13 cliques, and he did so by targeting young men in Boston area high schools, grooming them for horrific violence. He did so through his words and through his conduct (the latter of which the government continues to learn about to this day).

### 2.  MS-13's Presence in Massachusetts

In the years predating the Defendant's arrest, MS-13's transnational grip had spread to and taken root in numerous communities in Massachusetts.  Many parts of Massachusetts had been plagued by MS-13's brutal acts of violence that included the vicious attacking and killing of young men often on the unsubstantiated belief that they qualified as a gang threat (i.e., were a suspected gang rival or cooperator) to the MS-13 enterprise.

There was a brief reprieve following law enforcement's sweeping takedown in January 2016 during which over sixty MS-13 members of at least seven different cliques

---

[3] The U.S. Attorney's Office in the District of Massachusetts has similarly prioritized combating violence by this gang across administrations.  The investigations leading to the *United States v. Recinos Garcia et al.* case (before Judge Saylor) took place in 2014-2016, resulting in what was at the time believed to have been the largest single federal takedown of the gang in U.S. history.  *See, e.g.*, *United States v. Lopez*, 957 F.3d 302 (1st Cir. 2020) ("The backdrop of this sentencing appeal is the government's relentless pursuit of a notorious criminal gang, famously known as MS-13.").  The investigations into MS-13 activities in Massachusetts continued in 2017-2018 after the change in administration, work that led to the charges in this case in July 2019 as well as other indictments of MS-13 members in this District.  The focus on combating violence continues today.

were arrested, prosecuted, and convicted of various criminal acts ranging from firearm possession and drug distribution to and racketeering acts as serious as murder and attempted murder.  *See generally* PSR ¶ 36.  At the time, this was the largest federal takedown of MS-13 members in law enforcement history.  The takedown had a measurable impact in reducing MS-13 violence, disrupting the gang's activities, and weakening its hold on various communities in Massachusetts.

Despite the large volume of individuals and cliques caught up in the historical January 2016 takedown, two cliques lay beyond the reach (and at the time, the eye) of law enforcement's widely cast net—HLS and the Sykos clique.  *See generally* PSR ¶ 36.  In fact, HLS—historically one of the largest and most violent MS-13 cliques in New York and other areas in the country—largely had had no prior presence in the Boston area.  Yet in the wake of that massive takedown, and as those MS-13's members prosecutions were underway, a new era of MS-13 violence was conceived.  Like an unstoppable Hydra, new MS-13 members sprouted up with ambition to reconstitute the gang's hold in the Boston area, generate new cliques, and elevate their own individual gang status.

The Defendant was one such driven member who emerged in that new generation, and the investigation showed that he actively sought to reconstitute the HLS clique.  *See generally* PSR ¶¶ 42-51, 56, 98b.  He did so during a period where it seemed as though 2016's largescale takedown had led to a dramatic decline in MS-13 violence after years of horrific crime.  Indeed, after the January 2016 takedown, there seemingly was a successful period of deterrence in MS-13 violence, with a dramatic decrease in MS-13 violence in the 2016-2018 period.  *See, e.g.*, *Boston Breathing Easier After Major Raid on MS-13 Gang*, Associated Press, available at https://news.yahoo.com/major-raid-ms-13-gang-brings-relative-peace-043917377.html (published Oct. 8, 2018) (last accessed

Nov. 4, 2022).

In 2016, there was the notable December 2016 murder of Luis Ruano (which this instant case has now shown to have involved the participation of the Defendant). In 2017, there were no identified MS-13-related murders. The quiet on the MS-13 front, however, hid a darker reality that came to light in 2018: the gang was reconstituting and gearing up for a new period of violence.

In April 2018, law enforcement learned of the attempted murder of Victim 30 at the Belle Isle Marsh by MS-13 members based on the suspicion that Victim 30 was a rival gang member. *See generally* PSR ¶¶ 77-80. Victim 30 miraculously survived the incident, believing he had been struck in the head with a baseball bat by gang members when in reality he had survived a gun's malfunctioned firing. Victim 30 identified several MS-13 gang members whom he recalled being present, including HLS co-clique leader Amaya. *Id*. ¶ 80. Less than four months later, in late July/early August 2018, law enforcement learned of the body of a teenage male, Herson Rivas, who had been savagely stabbed to death in a park in Lynn. *See id*. ¶¶ 81-83. By August 2018, investigators were learning increasing information about two cliques that had been rising in power and reputation in the post-2016 vacuum, i.e., HLS and the Sykos, as well as the individuals heading them (which, for HLS, included the Defendant). Initial information suggested that these growing cliques might be connected to the startling violence that appeared to be intensifying in late spring/early summer 2018.

By late September 2018, when law enforcement learned of the Defendant's state arrest for a gang-related threatening and assault on an 18th street gang member in which the Defendant possessed a knife (on a public street during daylight hours, no less), *see* PSR ¶¶ 85-87, it was clear to law enforcement that they needed to act swiftly before any

further threats to public safety occurred.  The Defendant was arrested in late September 2018 on the knife charge, remaining in state custody and subsequent immigration custody prior to his July 2019 federal indictment.[4]  In the weeks following the Defendant's state arrest, law enforcement targeted its investigative efforts on the July 2018 Rivas murder— and by November 2018, members of the Sykos clique had been federally charged.[5]

### 3. <u>Uncovering the Defendant's Role in Reconstituting MS-13 in the Boston Area</u>

A cold reality set in as investigators began learning more and more information over the following year about the Defendant, HLS, and the Skyos clique: while law enforcement thought that they had significantly dismantled MS-13 after the 2016 takedown, the Defendant and others had been actively working—including within the Boston school system—to rebuild it and execute upon its violent mission.

Following the Defendant's state arrest, multiple cooperating witnesses detailed how the Defendant, alongside co-HLS clique leader Duende, sought to recruit them into HLS—including at school—and groom them for violence, instructing them on MS-13's rules, objectives, and punishments.[6]  *See* PSR ¶¶ 47-51; 98c.  The Defendant established his recruitment credibility by impressing upon others—through his words—his own self-proclaimed reputation and aptitude for violence, presenting himself as a committed MS-

---

[4] The Defendant ultimately pleaded guilty to carrying a dangerous weapon resulting in his release on January 30, 2019.  *See* PSR ¶ 130.  Days later, with public safety concerns still intact and the Defendant's unlawful immigration status still a factor, ICE agents took the Defendant into custody.  In late June 2019 (June 25, 2019), the Defendant testified (falsely, as addressed further herein) in removal proceedings.  By July 31, 2019, after nearly a year of learning more about the Defendant's role and involvement in HLS, he was indicted federally.

[5] As noted in paragraphs 6 and 8 of the Presentence Report, those defendants have now been sentenced to periods of incarceration ranging from 15 years up to life.

[6] One cooperating witness (CW-19) recalled there being a lunch table in the cafeteria strictly designated for MS-13 members.  *See* PSR ¶ 51.

13 member and leader to impressionable recruits.

The Defendant's use of words to recount his own supposed violent conduct to foster a culture of violence is noteworthy.  In the MS-13 gang world, participation in violent acts served to eliminate perceived gang threats.  But it also was a meaningful form of currency.  Participation in violent conduct allowed members to elevate in status from a low-level *paro* to a *chequeo*, and ultimately, to homeboy status.  *See* PSR ¶¶ 24-27. Violence equated to promotions, with murder being the strongest form of establishing eligibility and one of the surest ways to secure the highest leadership level.  Accordingly, one's reputation and even gang rank was only as strong as the foundation of violent acts upon which they were built.  As investigators uncovered more information about the Defendant, it became clear that, at a minimum, he had talked extensively to others about his knowledge of and involvement in violent acts (including murder)—which not only shows the reasonable foreseeability of murder to the Defendant within the racketeering conspiracy, but shows his personal commitment to that cause.  Cooperators' recounts of the Defendant's words, however, soon became corroborated by other pieces of evidence further connecting him to multiple violent acts in the Boston area during the years predating his 2018 state arrest.  That ultimately culminated (as recently as September 2022) with information from a cooperating witness establishing that the Defendant was a joint venturer at a December 2016 murder about which he had boasted to multiple other MS-13 members as to his involvement therein.

In sum: investigators moved quickly to have the Defendant arrested as a new wave of violence appeared to be emerging in the Boston area as to which they feared the Defendant was connected.  And following his arrest, investigators learned more about the Defendant, including his zeal for reconstituting HLS, his diligent recruiting of young

prospects, and his enthusiasm for violence that only reaffirmed their belief that the Defendant – if not stopped – would be unleashing a new chapter of MS-13 chaos within the Boston community.  Below are examples of the various forms of violent investigators uncovered as to the Defendant.

### a.  The December 2016 Murder

On December 24, 2016, Luis Fernando Orellana Ruano, a Guatemalan national who was 18 years old at the time of death, was lured to the James A. Sartori Stadium by MS-13 members on the (unsubstantiated) belief that he was a gang rival and threat to then be repeatedly and viciously stabbed to death.  PSR ¶¶ 62-63; 98h-98j.  The Boston Police Department reported to the stadium at about 11 p.m. after receiving a report of a body lying at the bottom of stadium stairs.  Law enforcement ultimately found Ruano's body as reported – at the bottom of some stairs leading down from the bleachers.



An autopsy by the Medical Examiner concluded that the manner of death was

homicide, and the cause of death was multiple sharp force injuries.  The victim had ***at least a dozen sharp force wounds consistent with a stabbing, with significant injuries to the neck, chest, and back***.  His throat appeared to have been slashed, and he had multiple incised wounds to the neck and multiple stab wounds to the chest.

The tragic murder largely went unsolved by law enforcement until they indicted and arrested several members of the Sykos clique in 2018 for the July 2018 murder of Herson Rivas.  One of the indicted Sykos clique members was Henri Gutierrez Salvador a/k/a Perverso.  While detained pending trial and believing he was confiding in a fellow MS-13 gang member (in fact, a cooperating witness), he confessed to his role in the December 2016 murder.  PSR ¶¶ 64-66.  In that recorded confession, Perverso identified individuals from the HLS clique as having assisted in luring out the victim, and specifically named co-clique leader Duende as having participated in the murder.  Other evidentiary pieces soon fell into the place.

Cooperating witnesses (including CW-22, CW-24, and CW-27) independently informed law enforcement that the Defendant had boasted about his involvement in the December 2016 murder of Luis Ruano (a/k/a Ardilla), claiming that he—alongside Duende and other MS-13 members—had stabbed a suspected gang rival to death at a stadium in East Boston.  While there may have been certain variations in the witnesses' stories, all provided a disturbingly consistent level of detail and a commonality of events that only someone with intimate knowledge of what had happened at the murder scene would have been able to share with them.  Multiple accounts described a unification across Sykos clique members and HLS members (with Perverso serving as a common denominator).

One cooperating witness's (CW-22) recollection of the Defendant and Duende's boasting was particularly troubling because the murder victim had been his friend, and the HLS leaders' words went beyond merely claiming credit. Rather, the Defendant and Duende zealously described their participation in that murder to the witness, going so far as to physically reenact the savage slashing of the victim before him. The Defendant and Duende recounted that brutality to CW-22 as they cruelly and callously mocked him for being saddened by his friend's death. PSR ¶¶ 73-76. According to CW-22, months before Ruano had even been murdered, the Defendant had forewarned CW-22 of the victim's impending fate, advising CW-22 to avoid his friend because MS-13 had targeted him for killing – plainly making Ruano's death foreseeable to the Defendant.

And in September 2022, still more information about the Defendant's connection to Ruano's December 2016 cruel stabbing came to light. This time, a cooperating witness (who was present at the actual murder) provided the most damning details of all about the Sykos and HLS clique's unification to eliminate a perceived gang threat: (1) the Defendant and other MS-13 members had plotted the targeting of Ruano and the location, time, and manner of his death; (2) the Defendant was present at Ruano's murder; (3) the Defendant was there under instructions from MS-13 leaders in El Salvador to ensure the victim's successful execution; and (4) if anything went awry during the pre-planned murder, the Defendant and other attending MS-13 members were to assist as needed. *See* PSR ¶¶ 98h-98l. Ruano's murder was not merely foreseeable to this Defendant or an act of violence to which he generally-and-unattachedly assented by virtue of being an MS-13 member in the Boston member around that period. The Defendant took an active role in targeting the victim, planning his murder, and participating in it, and he did so while willingly serving as the eyes and ears for MS-13 leaders in El Salvador to whom he was

under instructions to report upon the murder's completion.  Far from being merely foreseeable to the Defendant, he held a critical, merciless role in Ruano's tragic fate.

Despite witnesses' recounting of the Defendant having bragged to gang members and recruits about his knowledge of and involvement in Ruano's murder, and despite a joint venturer at the Ruano murder identifying the Defendant's elevated role in Ruano's murder plot and presence at the scene itself, the Defendant takes a striking position days before sentencing.  As repeatedly set forth in his numerous objections, the Defendant neither admits to his presence at the murder scene nor concedes any related boasting thereof to others – and he even goes so far as to object to the murder victim's family being notified.  *See* PSR at p. 51, 57-58, 63-67.  At most, as relayed to the government via a November 3, 2022 email, he concedes that on a technical level, the government now can satisfy its preponderance-of-evidence standard.  Murder is perhaps the most serious crime one can commit against another – causing harm to people, relationships, and the community.  The government's recommended sentence of 15 years is a just response to addressing that harm, for which this Defendant says no more than that the government has met its evidentiary burden at sentencing.

The Defendant's conduct in Ruano's murder – in and of itself – calls for the government's recommended 15-year sentence.  But the Defendant then remorselessly used that murder to lure more young men into MS-13, which further aggravates the heinousness of the offense.  Put another way, participating in Ruano's horrific murder did not deter the Defendant from MS-13's mission – he became further entrenched in it.  And most disturbingly, this was not the only time the Defendant was connected to murder.  In the two years following Ruano's death, this Defendant was connected to other senseless acts of violence that further underscore the need for a sentence that will protect the public,

deter future crime, promote respect for the law, and provide just punishment.  *See generally* 18 U.S.C. § 3553(a).

### b. Other Acts of Violence Connected to the Defendant

As set forth in the Presentence Report, the Defendant's thirst for violence and expanding MS-13's hold in Massachusetts remained steadfast and unsatiated in the years following Ruano's murder.  By the spring and summer of 2018, the Defendant was connected to two different plots to kill suspected gang threats.

The first – the attempted murder of Victim 30 at the Belle Ilse March – occurred in April 2018.  *See* PSR ¶¶ 80.  Similar to the Ruano murder, multiple cooperating witnesses independently informed law enforcement about MS-13's targeting of the victim for being a suspected rival gang member.  While there were variations in the witnesses' stories, the botched nature of the attempted murder (an MS-13 member's gun misfired, causing a bullet to graze the victim's head) and its location (Belle Isle March) were all consistent.

One witness (CW-22) described being at an MS-13 meeting with the Defendant and co-clique leader Duende soon after the attempted murder.  At that meeting, multiple members discussed the attempted murder and their belief that they had successfully killed the suspected gang threat.  PSR ¶ 77.  Another witness (CW-24), ***who himself was present at the attack***, identified both the Defendant and Duende as having been at the attempted-murder scene (which Duende's cellphone data also corroborated).  *Id.* ¶78.  Most troublingly, CW-24 identified the Defendant as the instigative force that put into motion MS-13's targeting of Victim 30 for murder.  *Id.*  That the Defendant himself did not pull the (misfiring) trigger against Victim 30 is a distinction without a difference. The Defendant set MS-13's murderous sights on Victim 30, and but for a malfunctioning

gun, the Defendant's words and actions could have resulted in another young man's death. Again, far from being merely foreseeable to the Defendant, he held a necessary role in initiating the spiraling of further MS-13 generated violent events in Massachusetts.

And, based on cooperating witnesses' information, only months later the Defendant and his co-clique leader had advance notice and knowledge of another young MS-13 member's life whom Sykos clique leaders had marked for murder on the (unsubstantiated) belief that he was a cooperator – this time, mere hours before the murder occurred in July 2018. *See* PSR ¶¶ 58-59, 81-83. One cooperating witness (CW-17) specifically recalled the Defendant communicating via phone messaging to Duende that Sykos clique members (including Perverso – of the December 2016 Ruano murder) had MS-13 member Herson Rivas with them in the car. CW-17 next observed Duende, based on the Defendant's transmitted communications, commenting on Rivas's pending death. As detailed in the Presentence Report, Rivas subsequently was barbarically stabbed to death in late July 2018 by multiple Sykos clique members (including Perverso). Though the Defendant is not being held accountable for this murder in connection with his guidelines calculation, it is highly relevant conduct when considering the factors under 18 U.S.C. § 3553(a). The Defendant, when aware of murder's pending occurrence, did nothing to stop it.

Nearly two months following the July 2018 killing of Rivas, law enforcement arrested the Defendant in September 2018, with a knife, on a public street, with Duende, pursuing a perceived gang threat (an 18th street gang rival). *See* PSR ¶¶ 84-87. While the defense may dismiss this incident as an otherwise uncorroborated, he-said-he-said skirmish, *see* PSR at p. 60, investigators' suspicions about that event were only confirmed following co-clique leader Duende's arrest. Upon review of his cellphone

communications, law enforcement recovered WhatsApp communications between Duende and a female associate in which they discussed the Defendant's presence at and participation in the attack on the victim, "Jerson" (the victim's actual name was "Gerson"), with Duende remarking, "***we almost killed*** that asshole Jerson."  PSR ¶ 87.

Thus, in the course of an approximate 5-month period, there were multiple incidents of violence involving the Defendant, further showing the troubling and continued escalation of the Defendant's conduct, his solidified commitment to MS-13, and the ongoing foreseeability of murder in connection with the conspiracy to which the Defendant has pleaded guilty.

### B.     The History and Characteristics of the Defendant Support the Government's Recommended Sentence

In addition to the nature and circumstances of the crime, the history and characteristics of the Defendant further support the government's measured sentencing recommendation.  The Defendant was not someone who was in the wrong place at the wrong time, or someone who hung out with the wrong crowd and did not know what he was getting himself into, or someone who engaged in wrongdoing and then had remorse and attempted to make amends or change his life for the better.  The history and characteristics of the Defendant paint a very different and far more troubling picture.

The Defendant is someone who claims that although he knew about the MS-13 gang and the dangers it posed, he was not in the gang in El Salvador.  Giving the Defendant the benefit of the doubt on that for present purposes, that means this Defendant had the ability and opportunity to leave behind the gang life in El Salvador and build a peaceful, productive life for himself in America.  After he came to the United States, despite his unlawful entry, he was further given the opportunity to obtain a free

public education at the local high school.  Instead of using that opportunity to build a better life for himself in the United States—which countless immigrants are desperately seeking as they attempt to escape from places like El Salvador—the Defendant committed himself to membership in one of the most violent organizations in the world, and further committed himself to recruiting others at the local high school to join his violent crew.

The Defendant's actions in the years following the Ruano murder paint a similarly troubling story about the kind of person he is and what his reaction has been to opportunities provided to him through luck or circumstance.  His commitment to MS-13 and his role in violence and the 2016 murder are, of course, by themselves damning facts about his history and background.  But what happened in the two years that followed raise even additional concerns.  For all intents and purposes, the Defendant and his fellow MS-13 members quite literally "got away with murder" in 2016.  For years, the Ruano murder remained unsolved and uncharged.  Did the Defendant treat that as a sign that he should perhaps change his ways?  No.  Did he express remorse, even in private, to any friends or associates?  No.  To the contrary, the Defendant began openly bragging about the murder to numerous friends and associates, used the murder to increase his status in the gang, and used that elevated status to further recruit young impressionable men and promote a culture of violence, encouraging them to hopefully kill one day like he had.

The types of evidence recovered to show the Defendant's commitment to the gang is remarkable.  There are examples of the Defendant communicating with MS-13 leaders in New York, PSR ¶¶ 42-46 (state wiretap call with HLS leader "Ghost"), MS-13 leaders around the country, *id*. ¶¶ 42, 92-93, 98d, 98e, 98i (WhatsApp communications addressing gang business matters, including the transmission of dues to El Salvador leaders), and even MS-13 leaders in El Salvador while involved in the charged

racketeering conspiracy, *id.* ¶¶ 98d, 98e, 98i.  Other evidence further corroborated the Defendant's commitment to the MS-13 cause, including evidence obtained from phones seized as part of this investigation. That evidence further showed his extensive communications with co-clique leader Duende and with MS-13 leaders elsewhere.  In one notable exchange with Duende (with whom the Defendant had previously committed murder already), Duende wrote, "I want to kill."  The Defendant, far from being troubled or trying to dissuade Duende, responded supportively with MS-13 rhetoric, "the Beast has to take that culero, brother."  PSR ¶ 90.   The Defendant's background and history are aggravating, not mitigating, factors in this case.

As one final example of the history and characteristics of the Defendant containing aggravating factors and further supporting the government's sentencing recommendation, the government points to the events of the month before the Defendant was indicted in this case, when the Defendant ***lied under oath to a federal immigration judge and committed fraud on the immigration court.***

At his June 2019 removal proceedings, the Defendant committed perjury and made numerous false representations to the court in his attempt to gain lawful status and remain in the United States.  Among other things, the Defendant brazenly lied about his association with Duende/Amaya, his connection to MS-13, and even about the alias he was soon thereafter indicted under.  Below are portions of his 2019 relevant exchanges (to be contrasted against the above-referenced conduct of the Defendant dating from 2016 through 2018):

Q:     ***Are you a gang member?***

Def:   ***No.***

Q:     ***Have you ever been a gang member?***

Def:    **_Never._**

Q:      Do you have friends who are gang members?

Def:     . . . I don't know if somebody was from a gang.

   *      *      *

Q:      How about Edwin Amaya? You know him, too, correct?

Def:    Edwin Amaya?

Q:      Yes.

Def:     Yeah, I know him.

Q:      How many times have you hung out with him?

Def:    Several times. . . .

Q:      **_Is Edwin [Amaya] involved with MS-13?_**

Def:    **_He never told me anything.  He never talked to me about gangs or anything like that, never._**

Q:      Okay, so to your knowledge, he's not a member of MS-13, correct?

Def:    I honestly don't know if he belongs to a criminal group. I just don't know.

Q:      **_Have you ever talked to him about MS-13?_**

Def:     **_No, never. We never talked about gangs.  We didn't have a deep relationship.  We didn't talk about gangs when we would go out, nothing._**

   *      *      *

Q:      Sir, do you have a nickname?

Def:    Every once in a while and as a term of endearment, they would call me, "Flaco."

Q:       Have you ever been called, "Rocky"?

Def:    No, I've always almost been called, "Flaco."

Q:      So you've never been called, "Rocky"?

Def:   No.

Q:   ***What's the Huntington Locos Salvatrucha, sir? . . .***

Def:   ***I don't know.***  The report, from what they explained to me, it's a clique that belongs to MS.

Q:   Ok, ***so prior to your arrest, you had never heard of the Huntington Locos Salvatrucha?*** . . .

Def:   No.

Q:   And also, ***you had never knowingly hung out with a member of MS-13 or 18th street, correct***?

D:   ***No.  Like I stated earlier, no, I never knew.  I never asked, inquired, any more deeply if they belonged to a gang.***

Tr. of Def's *In the Matter of Manuel Adan Yanez-Cruz (Respondent), In Removal Proceedings*, June 25, 2019 at 49-50, 70-71, 88-89.  Notably, the Defendant made these types of ***false and fraudulent statements under oath to a federal immigration judge after he had spent years as an MS-13 member and leader, and after he had participated in a murder.***  Remarkably, a review of the Defendant's immigration file confirms that he succeeded in duping the federal immigration judge, with the immigration judge concluding that notwithstanding the evidence that the government had presented at the June 2019 hearing about the Defendant's gang membership in MS-13, the court believed that the Defendant had been credible and sincere in his various statements that he was not in MS-13.  Among other things, the court found:

> Although the government has presented official records of the government showing that various agencies within the government documenting the view of those agencies that the respondent is affiliated with the MS13 gang, the court is not persuaded by these documents alone.  … Of course, the court cannot know for certain, but based on the evidence presented before the court as of this time, the court accepts the respondent's in-court testimony as credible.

June 25, 2019 Oral Decision of the Immigration Judge.  (Of course, unbeknownst to the immigration judge, a federal grand jury was soon about to indict the Defendant for racketeering conspiracy on behalf of the MS-13 enterprise.)  After the June 25, 2019 decision, which credited his testimony but did not grant him asylum, the Defendant filed a motion to continue the immigration proceedings so that he could pursue a Special Immigration Juvenile Visa or I-360 application.  Thankfully, by the time the immigration court ruled on that request, the Defendant had already been indicted in this case, a fact that the immigration court noted as a significant factor when denying further relief in August 2019.

The government provides all this background to the Court because it cannot help but comment on the fact that this Defendant is at least the ***third MS-13 defendant to be sentenced in this District this year alone*** who committed perjury before the immigration court and attempted to defraud himself into obtaining lawful status, despite being an MS-13 member who had committed murder.  Henri Salvador Gutierrez a/k/a Perverso, one of the MS-13 members with whom this Defendant committed the December 2016 murder was another such person who also lied to the immigration court about his MS-13 membership, despite already having committed a murder on behalf of MS-13.  *See, e.g.*, 18-cr-10450-2, Dkt. No. 749 (Govt. Sentencing Memo. re Salvador); *see also* Press Release, available at https://www.justice.gov/usao-ma/pr/ms-13-member-sentenced-life-prison-rico-conspiracy-and-brutal-murder-two-teenagers (Govt. Press Release after Salvador was sentenced to life in prison for the murders of Ruano and Rivas, and further noting that defendant's similar perjury and fraud before the immigration court).

In addition to all of the above, the government also notes how the Defendant's private communications with others reflected deeply troubling beliefs capturing his

commitment to MS-13 and his thirst for violence, yet the Defendant then outright denied any inclination for violence or affiliation with MS-13 when in court. Even years later, in the probation interview conducted in connection with this sentencing, the Defendant "declined to answer any questions about gang involvement or membership." PSR ¶ 151. And after the PSR came out, the defendant (through counsel) filed 50 lengthy objections that took issue with countless parts of his offense conduct, including objecting to his involvement in murder (although he now appears to have backed off that, perhaps recognizing the futility of such an argument given CW-28 coming forward with additional incriminating information).

This Court should keep this Defendant's history of lies, deceit, false denials, and equivocations in mind when viewing any self-serving statements he might be inclined to make at his sentencing hearing.

Having said all of the above, the government addresses certain mitigating factors that it expects the defense will discuss in greater detail in its sentencing arguments. Those include the Defendant's youth and, at times, challenging upbringing (including, *inter alia*, adoption, financial struggles, bullying, familial discord, and gang presence). The government considered and incorporated those factors when ultimately deciding upon its sentencing recommendation of 15 years for the Defendant, which falls below the otherwise applicable 20-year statutory maximum. Indeed, were it not for these mitigating factors, the government undoubtedly would have sought the statutory maximum sentence of twenty years for the Defendant. No further leniency or variance is called for.

The government acknowledges that the Defendant had a difficult upbringing in El Salvador. Unfortunately, these are not factors unique to this Defendant. Moreover, they must be considered in the greater context of his overall disturbing and criminal conduct.

When viewed through that lens, this history and characteristics only highlight the Defendant's hardheartedness. The Defendant, like many of the young men he groomed and targeted for recruitment into MS-13, knew what it was like to have been uprooted from one's home, family, and country to move elsewhere feeling culturally adrift while struggling with a foreign language. Instead of using that commonality to forge friendships, however, the Defendant forged alliances with MS-13 members within Massachusetts and elsewhere in the United States – the very gang from whom he supposedly was fleeing on departing El Salvador. *See* PSR ¶¶ 41, 46, 98b. The Defendant also used such history and characteristics to manipulate and lure others into a ruthless gang in which he eagerly sought to rise in rank, reputation, and numbers. *Id*. ¶ 98n.

And while the defense will likely point to the Defendant's upbringing and youth as grounds for mitigation, the evidence is overwhelming that once the Defendant became an MS-13 gang member, he was all in. He was so committed to the gang that he ambitiously pursued a leadership position in a clique that previously held no presence in the Boston area. *See* PSR ¶¶ 36; 98b.

Further, it is insulting to the peaceful immigrants in our community, whether they came to the country lawfully or not, to point to the Defendant's background as some sort of explanation for his deplorable conduct. There are countless immigrants who have fled troubling circumstances in El Salvador and other countries seeking a better life and greater opportunities elsewhere. The government rejects the notion that those circumstances place individuals on a predestined path to a life of crime. The Defendant's words show how the harm he has caused radiates beyond his conduct in connection with MS-13. Having manipulated numerous young men into joining MS-13 ranks by touting his leadership position and acts of violence, the Defendant attempted to fraudulently

portray a wholly distinct image of himself to an immigration court to avoid deportation. In doing so, the Defendant generated a ripple effect of harm onto others who legitimately seek to avail themselves of the United States' complex immigration system. The Defendant had the opportunity to obtain a free public education and make a better life for himself in this country. Instead, he committed himself to leading a gang whose core organizing principle was violence.

The government has given significant thought to how the history and characteristics of the Defendant should impact the Court's sentence. Having reflected on any mitigating factors, the government reasserts that a 15-year sentence is appropriate under 18 U.S.C. § 3553(a) factors as to this Defendant, particularly when those factors are balanced alongside the other sentencing factors.

**C.  The Need to Reflect the Seriousness of the Offense, Promote Respect for the Law, and Provide Just Punishment All Support the Government's Recommended Sentence**

The other section 3553(a) factors all similarly support the government's recommendation. Information that law enforcement has uncovered—and continues to uncover—about the Defendant shows his unwavering acceptance of MS-13's core principles of violence and his promotion of those principles onto others. It is hard to imagine a crime more serious or more demanding of just punishment than murder. Here, the Defendant committed himself to a violent gang whose core operating principles include murder, and where conspiracy to commit murder was a central tenet of the gang to which the Defendant swore his allegiance. The Defendant, in fact, was a leader and recruiter in this violent gang. The Defendant was connected to multiple acts of violence, including murder and attempted murder, and to this day, appears to show zero remorse. In fact, evidence shows that the Defendant proudly touted his connection to such

murderous acts amongst juveniles whom he sought to bring alongside him into MS-13's ranks, grooming them to mindlessly execute in furtherance of MS-13's core mission. MS-13 is a gang that routinely recruits teenagers, that preys on vulnerable juveniles in our local high schools, and that promotes a culture of violence and encourages young men to commit senseless murder. That the Defendant eagerly worked to build up a historically absent MS-13 clique following the 2016 takedown is highly relevant: Watching the fate of those sixty-plus MS-13 members did not deter the Defendant from embracing the gang; it emboldened him. He was all in—even being willing to commit fraud in the U.S. immigration system to ensure his continued status in Massachusetts.

All of this evidence calls for a sentence that will protect the public and promote respect for the law and deterrence from further crimes. The Court's sentence should in no uncertain terms send a message about how serious the Court finds the racketeering activity of MS-13, even if committed by someone who may have a more complicated background. In this case, a sentence of 15 years in custody—a significantly lower sentence than the one called upon by the guidelines or statutory law—is necessary to comply with the purposes of sentencing outlined in 18 U.S.C. § 3553(a).

### D.   The Need to Avoid Unwarranted Sentencing Disparities Further Supports the Government's Recommended Sentence

The government's recommended sentence of 15 years for the Defendant is also appropriate when considered against the backdrop of dozens of other MS-13 members who have been convicted and sentenced in Massachusetts in recent years. *See* 18 U.S.C. § 3553(a)(1)(6) (noting "[t]he need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct").

A sentence of 15 years would avoid unwanted sentencing disparities, and it is a sentence based on the government factoring in the dozens of MS-13 sentencings in this District in recent years.  In case this Court is curious, included below are some of the most analogous situations that the government could find from the dozens of MS-13 sentences in recent years.  The sentences below are from *United States v. Recinos Garcia et al.*, 15-10338-FDS and involve defendants who were convicted for RICO conspiracy and held responsible for their roles relating to the murder of a victim (but who did not personally stab or shoot the murder victims), and who received sentences well above 15 years:

- Defendant Oscar Noe Recinos, a/k/a Psycho, was responsible for directing MS-13 members to carry out a murder, and he helped identify and target the murder victim. In contrast to this Defendant, however, Recinos was neither an MS-13 leader nor was he present at the murder scene.  He received a sentence of ***276 months' imprisonment***. *See* 15-cr-10338-1.

- Defendant Jose Rene Andrade, a/k/a Triste, participated alongside other MS-13 members in coming up with the plan to target and murder a particular victim.  In particular, Andrade contacted MS-13 members in El Salvador to obtain a green light to kill the victim.  Andrade, however, was not present at the murder (unlike the Defendant in this case)—in fact, he was arrested before the murder even occurred.  And he (unlike the Defendant) was not a leader.  He received a sentence of ***268 months' imprisonment***. *See* 18-cr-10338-19.

- Defendant Bryan Galicia Barillas a/k/a Chucky was (like the Defendant in this case) present at the scene of a murder.  He provided the murder weapon to the shooter and was otherwise present at the scene assisting.  He also

(like the Defendant in this case) participated in a separate attempted murder.  He received a sentence of ***264 months' imprisonment***.  *See* 18-cr-10338-28.

As a further point of comparison, the government notes the case of *United States v. Cristian Alvarez Hernandez*, 17-cr-10373-MLW.  Alvarez Hernandez was not an MS-13 leader and was not present at a victim's murder, but he was a young MS-13 member who was committed to MS-13's cause, and he had contributed to a spiraling of events that tragically resulted in that victim's death (i.e., getting into a fight with the victim at school, creating a Facebook page to lure out rival gang members, like the victim, and giving access of that Facebook page to another gang member who then participated in the victim's murder).  However, unlike this case, Alvarez Hernandez was *not* held responsible for murder, and his guideline range was 97-121 months.  That defendant received a sentence of ***121 months' imprisonment***—the top of the guideline sentencing range applicable to him.  Here, the government is asking for less than five years more for this Defendant, who (unlike Alvarez Hernandez) was present at the scene of the murder, is being held responsible for murder, was a leader in the MS-13 gang, and has a guideline range at the statutory maximum.

For all of these reasons, the government believes that a sentence of ***180 months*** imprisonment followed by ***three years of supervised release*** is sufficient, but not greater than necessary, to comply with the factors under 18 U.S.C. § 3553.  It reflects the seriousness of the offense, promotes respect for the law, provides just punishment, protects the public from further crimes of the Defendant, affords adequate deterrence, and avoids unwarranted sentencing disparities with defendants who engaged in similar conduct.

## CONCLUSION

For the reasons stated in this sentencing memorandum and those to be advanced at the Defendant's sentencing hearing, the government respectfully requests that the Court sentence the Defendant to ***180 months in custody***, to be followed by ***three years of supervised release***.

Respectfully submitted,

JOSHUA S. LEVY
Attorney for the United States,
Acting Under Authority Conferred
by 28 U.S.C. § 515

By: /s/ Kaitlin R. O'Donnell
KUNAL PASRICHA
KAITLIN R. O'DONNELL
Assistant United States Attorneys
District of Massachusetts

## <u>Certificate of Service</u>

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing and paper copies will be sent to those indicated as non-registered participants.

By: <u>/s/ Kaitlin R. O'Donnell</u>
     KAITLIN R. O'DONNELL
     Assistant United States Attorney
     District of Massachusetts