UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

DOCKET NO 19-10268

UNITED STATES

v.

MANUEL ADAN YANEZ CRUZ

SENTENCING MEMORANDUM OF THE DEFENDANT

1. INTRODUCTION.

Manuel Yanez Cruz pled guilty to one count of racketeering (18 USC § 1962(d)) . He admitted that he was a low-level leader of MS-13 and recruited minors while he himself was a minor.  He  agreed that MS-13 is an organization that uses violent means to achieve its ends and that, as a leader, he endorsed those means and encouraged others to share those goals.

The government's draft offense conduct totaling 47 pages was adopted, word for word in the PSR including many assertions which added no facts but were the gratuitous opinions of the government, better suited to a sentencing memo.  Eight of the defendant's objections covering eighteen different paragraphs point this out. [Objections 12-20] In turn, the responses by probation to Yanez-Cruz's objections  adhere to the government line. The objections are the method by which Yanez Cruz can convey to the Court his concerns about opinions masquerading as facts.  As such, these objections do not need to be factually resolved by the Court.

 The draft pre-sentence report was provided to the parties on June 8, 2022.  It asserted that Yanez Cruz conspired in the murder of Ruano.  Yanez Cruz filed his objections to the draft PSR on June 22,2022.   Yanez Cruz did not participate in this murder and, in our opinion, the

1

government, at that time, had not met its burden of proof by a preponderance of the evidence.  On October 26, 2022 the  government revealed to the defendant that CW-28 had become a cooperating witness.  This information was incorporated into the final PSR which was provided to the parties on November 1,2022.  The defendant does not agree that all the statements of CW-28 are true.  He reasserts his position that he did not participate in the murder of Ruano, but agrees that, with this additional information, the government has met its burden that, at a minimum, Yanez Cruz knew about the plan to kill Ruano in advance and did not oppose it.  Accordingly, he agrees that the base offense level is 43. [PSR ¶ 105].

Yanez Cruz has never disputed that he is a low-level leader of the Boston Huntington clique nor that he recruited minors. In his plea, he agreed that the base offense level may be increased by 4 points for his leadership role and 2 points for recruitment of minors, while he was also a minor.  In his objections, he disputed that  these characteristics should be grouped within the conspiracy to murder Ruano  because he was not a leader in this activity nor recruited others to participate in it.  The end result is the same, that the adjusted offense level is 49, but as a total offense level and not a subtotal PSR [¶ 111 ].

Yanez Cruz did not participate in the planning or the assault on V-30 and does not agree that there is a second grouping for sentencing guideline calculations.  He also does not agree that he recruited others or acted as a leader in this assault.  His objections on this point [ See  Objection # 9] demonstrate, at a minimum, that the government has not met its burden of proof here.  As a practical matter, even if the calculation of the PSR is accepted, it adds only one point to the  overall calculation and does not substantially alter the guideline analysis.

II.  WHO IS MANUEL YANEZ CRUZ?

Manuel Yanez Cruz was born in El Salvador in 1999. He was adopted at birth by Nicanor Yanez and Rosa Livia Cruz and raised in the province of La Union. He never knew his real mother and envied his older sister who was also adopted, but knew her real parents and participated in their family activities. In the small community where he was raised, it was known that he was adopted and, as a result, he was bullied and teased about it, as though his mother rejected him. He was also teased about being skinny. Yanez Cruz, like many adopted children, shares the visceral sense of having been abandoned and the search for family and belonging.

In the seventies and the eighties, El Salvador was engaged in a violent war between factions who wanted to control the government of the country. Although in 1992, the war was declared "over," there was no stable government and matters were controlled by various violent gangs, especially MS-13 and Eighteenth Street. This instability and power of the gangs continues today. Upon release from the BOP, Yanez Cruz faces an uncertain and danger-laden future.

The violence engendered by the war and its aftermath required protection not provided by the embattled government. Different areas of El Salvador were and are controlled by one or another gangs and Salvadorans are obliged to be loyal to the gang that controls their home area, whether or not they are formally affiliated with the organization. Yanez Cruz is from an area of La Union that is an MS-13 area. Growing up in a small town, he knew men who were members of MS-13, but at his young age, he had not yet been forcibly recruited.

In that environment, these gangs prey on youths who are inoculated into the toxic culture and perpetuate the violence. Violence is not gratuitous, but expected and required. This dynamic is described here, not as an excuse, but rather as an explanation of the pressure and

3

perception that existential survival requires the elimination of others who would seek to eliminate you.  The demand for loyalty to the gang reinforces this insular view and makes it extremely difficult to maintain independence, especially for young men.

Yanez Cruz left El Salvador when he was fifteen to help support his family and to avoid recruitment into the quasi-military forces in El Salvador.  He was detained by the INS at the border, then transferred to a locked detention center in New York.  A distant uncle from his adoptive family, whom he had never met, agreed to house him, and he was released .  He entered high school in Chelsea, isolated, with really no English language skills and knowing no one.  When he was not in school, he was working.  He was exhausted and failing at school, missing his adoptive family and feeling very lonely and alone.

To his surprise, the life- threatening  rivalry between MS-13 and 18th Street continued here.  Since he is from La Union, it was assumed that he was with MS-13.  Eighteenth Street members would chase him after school and pressure him to reveal his affiliation.  Although he did not get into physical fights at the high school, he felt  existentially threatened and anxious.

Jose Amaya Mejia is also from La Union .  Although they knew each other casually there, they did not become close friends until they were here.  Amaya Mejia had similar problems here and they decided to form their own clique, affiliated with MS-13. (Amaya Mejia has also pled guilty to being a leader).  Yanez Cruz joined MS-13 for protection and respect and to feel not alone, but belonging to something.  By reason of his life circumstances, he was emotionally and psychologically vulnerable to the allure of the gang culture. This motivation is hardly unique to Yanez Cruz who was fifteen years old. For example, CW-19 told the Grand Jury that he joined MS-13 for protection and respect in the street, because he was being beaten

4

up by 18th Street and had other issues with them. (Bates #1548).

Either Amaya Mejia or Yanez Cruz knew someone in El Salvador who was vaguely affiliated with the Huntington group, and they self-affiliated their nascent group with the Huntingtons. Although the New York Huntingtons are large and powerful, the Boston group was small, composed entirely of adolescents, lacking both turf and homeboys. The government seeks to hold Yanez Cruz knowing and responsible for every action and interaction of MS-13 and Amaya Mejia. However, this was not the case. The two teens worked at different places with almost opposite hours of work, and had overlapping but not identical groups of friends.

As previously noted, the violence which engendered MS-13 and other gangs informs the compelling notion that staying alive requires constant vigilance and defense. The gang provides order in an otherwise chaotic environment and especially in an alien country, provides a community of self-support, belonging and family. In addition to providing protection, the local Huntington clique had rules which prohibited, for example, excessive drinking, use of drugs other than marijuana, and required its members to work. The organization collected dues primarily to benefit its members and to send to El Salvador. This fund was more aspirational than actual, because the group never collected much monies. It initiated members into the organization by "beating them in". Beatings were imposed on members who ran afoul of the rules of the clique. The punishment paradigm was consensual, as there was agreement about the rules. One example provided in the discovery, is that Amaya Mejia got very drunk and was beaten. Yanez Cruz participated in some of these beatings.

III. WHY THE COURT SHOULD IMPOSE AN EIGHT YEAR SENTENCE.

Yanez Cruz was arrested on September 26, 2018 and has had no contact with Amaya

Mejia or anyone else from MS-13 since that day. He was released from state custody for about six days, and then arrested and detained by Immigration. On August 1,2019, he was transferred from Immigration to the US Marshalls for this offense and has been detained since that time. In total, he was detained for 307 days prior to the beginning of this federal case, although he will receive no BOP credit for that time.

18 USC § 3553(a)(1) mandates the Court to "impose a sentence sufficient, but not greater than necessary to accomplish the sentencing goals advanced in 3553(a)(2)," namely, retribution, deterrence, incapacitation, and rehabilitation. See *Kimbrough v. United States*, 552 U.S. 85, 101 (2007) . For Yanez Cruz , an eight-year sentence is sufficient to satisfy all purposes of sentencing. At his young age, it is more than one third of his total life lived to date.

There is little question that the scourge of all gangs in America cry out for mechanisms to eliminate or militate against the damage caused. This is especially true for MS-13. Born out of young groups of Latinos in Los Angeles, fleeing El Salvador and Honduras, and threatened by other Los Angeles gangs, they vowed to become the strongest in "control." *See MS-13 in the United States and Federal Law Enforcement Efforts, Finklea, Congressional Research Service 2018, See Ex. B.* Recruited at a young age, once a person joined a gang for protection and/or peer pressure, the likelihood of criminal activity increases. 1

18 USC §3553(a) first directs the Court to consider the defendant's history and characteristics as well as the nature and circumstances of the offense. Yanez Cruz was born into a violent and unstable environment, including hard scrabble

---

1 *See* Herbst, *The Likelihood of Gang Membership: Immigrant Generational Differences Among Hispanic Youth, reported at: https://etd.ohiolink.edu/rws_etd/document/get/bgsu1377696883/inline, See Ex. C.* Once in, it is almost impossible to get out.  *See* Blitzer, T*eens Trapped Between a Gang and the Law, New Yorker January 1, 2018, See. Ex. D.*

poverty, political violence, natural disasters, gangs, and general community violence.  Yanez Cruz was fifteen when he came to the United States and barely seventeen when Ruano was killed.

Though just barely an adult for legal purposes, there is growing scientific consensus that, developmentally, this is a distinction without a meaningful difference. On the contrary, the critical areas of the brain responsible for judgment and decision-making continue developing into the early 20s through approximately age 26. Courts increasingly recognize this fact, and reckon with its implications ,when sentencing young people.

Courts have long recognized that youth bears on an individual's blameworthiness and culpability in committing a criminal offense. "The basis for this conclusion is too obvious to require extended explanation." *Thompson v. Oklahoma*, 487 U.S. 815, 835 (1988). Less than a year ago, the Supreme Court affirmed this conclusion, stating "youth matters in sentencing." *Jones v. Mississippi*, 141 S. Ct. 1307, 1314 (U.S. 2021). Youth matters, not just as grounds for generalized leniency, but because with brain maturity many of the risk factors that are attendant to youth naturally diminish. Courts have repeatedly recognized that, because of their reduced cognitive, interpersonal, and emotional capabilities, adolescents and young adults are less blameworthy than mature adults when they engage in criminal behavior.

In *Roper v. Simmons*, 543 U.S. 551 (2005), the Court identified several meaningful differences that separate juveniles under 18 from adults that bear upon an assessment of blameworthiness. First, juveniles tend to lack both maturity and a sense of responsibility, "often result[ing] in impetuous and ill-considered actions and decisions." *Id. at* 569.  Wisdom and judgement come with age.

Second, "juveniles are more vulnerable or susceptible to negative influences and outside pressures, including peer pressure." *Id.* They have limited "control[l] over their own environment" and lack the ability to extricate themselves from horrific, crime-producing settings. *Id* .Finally, "the character of a juvenile is not as well formed as that of an adult." Therefore, his or her actions are less likely to be "evidence of irretrievable[e] deprav[ity]." *Id*. at 570 (emphasis added). Based upon these differences, the Court held the death penalty unconstitutional for offenders under the age of 18. *See id.* at 575.5

In identifying these factors, Courts have been informed by evolving research in neuroscience and developmental behavioral science, a field in which society has made great advances in the last several decades. The *Roper* court identified immaturity as the first factor that distinguishes youth as a matter of everyday experience, neuroscience tells us more. "The prevailing neuroscientific explanation for adolescents' immaturity begins with the fact that [t]he frontal lobes, home to key components of the neural circuitry underlying 'executive functions' such as planning, working memory, and impulse control, are among the last areas of the brain to mature; they may not be fully developed until halfway through the third decade of life."2  As a result, Dr. Kinscherff explains, "Adolescents as compared to adults have difficulty in recognizing the long-term consequences of decisions and actions. and are more prone to impulsive and even reckless behavior than are adults. This is due to their neurodevelopmentally

---

2 *See, e.g.* FINDINGS OF FACT ON BRAIN DEVELOPMENT AND SOCIAL BEHAVIOR AND RULING OF LAW ON WHETHER MANDATORY LIFE-WITHOUT-PAROLE SENTENCES FOR DEFENDANTS AGE 18 THROUGH 20 AT THE TIME OF THEIR CRIMES VIOLATES THE MASSACHUSETTS DECLARATION OF RIGHTS, Ullmann, J., Suffolk Superior Court, finding as a matter of state constitutional right that the considerations attendant upon adolescent brain development be extended to 20-year-olds.

based predispositions across multiple contexts to be present-focused and to (a) fail to identify, and/or (b) to "discount" (weigh as less likely or significant as compared to adults) both future rewarding and adverse consequences of their decisions." This is translated into the risk taking and immediate reward seeking behavior so common to adolescents and emerging adults like Yanez Cruz.

The next distinguishing factor identified by the *Roper* line of cases is susceptibility to negative influences and peer pressure. *Roper*, 543 U.S. at 569. Again, the evolving science underscores this conclusion. As Dr. Kinscherff explains, peer influence exacerbates the risk-taking tendencies inherent in immature brains:

Their proclivity for risk-taking is particularly heightened when they are with peers as reflected in increased activation of brain regions associated with assessing and valuing potential rewards. This differential weighting of potential rewards in the presence of peers occurs even when adolescents know the probabilities of negative outcomes. This process is furthered when "social norms" favor risk, increased arousal when peers are present, and an adolescent-specific greater sensitivity to perceived "social evaluation" by those peers. As one Court observed, "Neuroimaging studies show that 'impulsive or risky choices often coincide[e] with the increased engagement of [the former] and the decreased involvement of [the latter]." And the presence of peers exacerbates that effect. *United States v. Ramsay*, 96-cr-1098 (JSR), 2021 WL 1877963, at *10 nn.35-36 (S.D.N.Y. May 11, 2021). These factors are manifestly present with Yanez Cruz.

The final factor addressed by the *Roper* line of cases and supported by the evolving science is the mutability of the juvenile brain. This is perhaps the most critical factor in the brain

9

development of young adults. As the *Roper* court explained, because a young person's traits are "less fixed" his actions are less likely to be "evidence of irretrievable[e] deprav[ity]." There is a growing scientific consensus that key areas of the brain relevant to decision-making and judgment continue to develop into the early twenties. This science suggests that "while other brain systems largely mature by later adolescence, development of the prefrontal cortex (implicated in judgment, risk-perception, option detection, self-control and other "higher order" cognitive functions) continue to mature into the mid-20's. The imbalance of the developmental timeline of brain regions of earlier evolutionary origin and the prefrontal cortex yields the greater adolescent—and early young adult—vulnerable to errors in social judgment, the disproportionate influence of peers and others whose opinion the young person values, risk-taking, and ill-considered action (especially in conditions of emotional arousal)." Id. at ¶35. Yanez Cruz is already on this path as noted in more detail below.

Given that "youth matters in sentencing," *Jones v. Mississippi*, 141 S. Ct. 1307, 1314 (2021) and that we now understand that youth extends well beyond 18, this Court should consider the science of adolescent neurodevelopment in determining the appropriate sentence for Mr. Yanez Cruz.

Yanez Cruz is such an individual recruited into MS-13 at an early age, an age where the brain had not yet fully developed, an important mitigating factor. See U.S.S.G. § 5H1.1. Justice Breyer, in his concurring opinion in *Miller v.Alabama*, 567 U.S. 460 (2012), which was joined by Justice Sotomayer, raised a question whether juveniles (which equally applies to adolescents and young adults (as set forth in the Kinscherff affidavit submitted in *United States v. Edwin Gonzalez*, 15-cr-10338-FDS) have the same *mens rea* as adults in committing crimes:

> [T]he ability to consider the full consequences of a course of action and to adjust one's conduct accordingly is precisely what we know juveniles lack capacity to do effectively. *Ante*, at 8–9. Justice Frankfurter cautioned, "Legal theories and their phrasing in other cases readily lead to fallacious reasoning if uncritically transferred to a determination of a state's duty toward children." *May v. Anderson*, 345 U. S. 528, 536 (1953) (concurring opinion).

The separation has allowed Yanez Cruz to reflect on his prior decision to join the gang. He considers it a mistake and is determined to take a different path when he is released. He is embarrassed to tell his parents in El Salvador that he joined MS-13 and that now, as a result, he is a convicted felon and will be deported when he completes his sentence. In one sense, the arrest by the state for illegal possession of a box cutter, was timely for Yanez Cruz. He was a *chequeo* in the organization, a relatively minor leadership position and had not yet personally engaged in killing or in the other types of violent actions which allow gang members to achieve higher status. His physical actions with MS-13 up to this point, consisted primarily in joining in the beatings. Had his connection with MS-13 not been interrupted, he might have felt forced to participate more actively. Since his arrest in the state case, he has been detained without incident, in four different locations. Notably, he has never been cited for aggression or fights in his four years of incarceration.

The PSR correctly calculates his criminal history as Category II, for his one conviction for possession of a box cutter. As part of the offense conduct, the PSR cites only the report by Gerson, an 18th Street member who claimed that Yanez Cruz and the " Amaya brothers" initiated an attack on him. This version of events is not corroborated. The government claims that the statement by Amaya Mejia to a colleague, after the fact, that " we almost killed Gerson" corroborates this version. However, it does not address who initiated the attack, nor do we know whether it was a true perception by Amaya Mejia or braggadocio. Notably, the statement by

11

Gerson and the police report do not include any details that anyone was touched or attacked and the police report has no description of any visible signs of injury to anyone.

Yanez Cruz has used his time in detention to improve his English and to participate in any courses that are available to him. He obtained a dictionary from the prison library and has used it to help him read and write in English. At the Wyatt, he is participating in an English class and a GED preparatory. He hopes to complete his GED and, if available, to learn computer skills and accounting. He would especially like to learn a trade that he can use in El Salvador such as electricity. He asks the Court to recommend that he serve his incarceration where there are educational programs. He also hopes that he will be in an institution where he can work and earn some money, even if not on a par with what he would earn on the outside.

Yanez Cruz has worked almost every day that he has been in the United States and besides economic necessity, it has provided him with a structure and tasks that he can do well. The PSR notes that a manager at Schwarma King told Probation that he was a " great worker, never late or disrespectful, very reliable" and " we would be happy to take him back."   [¶ 157]

After his incarceration, he will be deported. This status will prohibit him from participation in a halfway house in the last six months of his tenure. He is quite anxious about what may happen to him upon arrival there. He has anxieties that are not completely unfounded that he will be dragged from the airport and summarily executed by the government or one of the gangs or be placed in one of the violent prisons. Since he became president in 2020, Bukele has used the army to arrest persons on suspicion of gang affiliation. Many have died in violent prisons or were killed by the soldiers.

For these reasons, Manuel Yanez Cruz asks this Court to sentence him to eight years of

incarceration with credit for time served on this offense.

Respectfully Submitted,

   /s/<u>John Cunha, Esq.</u>　　　　　　　　　　　　　　　　November 6, 2022

      /s/ Lenore Glaser, Esq.
Lenore Glaser, Esq.  BBO # 194 220
Of counsel, Masferrer and Associates
55 Union Street, 4th Floor
Boston, MA. 02108
   617  918-9807
lglaser@glaser-law.com

**CERTIFICATE OF SERVICE**
**I. Lenore Glaser, hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on: November 6, 2022.**
**<u>/s/ Lenore Glaser</u>**